# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

ELICE LIPPINCOTT,

                                    Plaintiff,                    DECISION & ORDER

                    -vs-                                          10-CV-6417-CJS-MWP

TARGET CORPORATION,

                                    Defendant.

---

## APPEARANCES

For Plaintiff:                      Christina A. Agola, Esq.
                                    1415 Monroe Avenue
                                    Brighton, NY 14618
                                    (585) 262-3320


For Defendant:                      Peter A. Walker, Esq.
                                    Seyfarth Shaw LLP
                                    620 Eighth Avenue Suite 3300
                                    New York, NY 10018
                                    (212) 218-5570

                                    Daniel B. Klein, Esq.
                                    Seyfarth Shaw LLP
                                    World Trade Center East
                                    Two Seaport Lane, Suite 300
                                    Boston, MA 02210
                                    (617) 946-4800

## INTRODUCTION

**Siragusa, J.** This Age Discrimination in Employment ("ADEA") case is before the Court on Defendant Target Corporation's ("Target") motion for summary judgment, filed on January 31, 2012, ECF No. 27. After considering the papers filed on both sides, and having heard oral argument, the Court grants Target's motion.

## FACTUAL BACKGROUND

Pursuant to W.D.N.Y. Loc. R. Civ. P. 56, Target filed a statement of undisputed facts, and Plaintiff Elice Lippincott ("Lippincott") filed statements in response. Based on those statements, and unless otherwise stated, the following facts are undisputed.

Target operates retail stores around the United States selling clothing, toys, household goods, food, beauty supplies, and electronics. Lippincott worked for Target from January 31, 2005, until she resigned on July 7, 2009. She began employment with Target as an Executive Team Leader of Guest Services, and later assumed the position of Executive Team Leader of Hardlines ("ETL-Hardlines"). Lippincott was age 44 when hired, and age 48 at the time of her resignation.

Target's anti-discrimination, anti-harassment and anti-retaliation policies are contained in its Executive Team Member handbook. Target has an open door policy and invites its team members (*i.e.*, employees) to voice concerns about discrimination in the workplace, and enforces its anti-discrimination policy by investigating any complaints of unlawful discrimination. Target prohibits retaliation against applicants or team members who report or oppose unlawful employment practices. When she started her employment with Target, Lippincott received the handbook and reviewed the policies contained in it.

Target also provides training on its policies and practices, including discrimination and harassment in the workplace, and on more than one occasion, Jeffrey Schultz ("Schultz"), Lippincott's supervisor and Target's Store Team Leader ("STL") of its Irondequoit, New York, store, received this training. Target also offers various training classes to managers throughout their employment, which focus on addressing managerial responsibilities in the workplace and other aspects of a managerial position. Plaintiff occasionally attended such training courses during her employment.

Each Target store has a STL who is responsible for the day-to-day operations and supervision of the Executive Team Leaders ("ETL") at that location. Additionally, STLs are responsible for providing feedback to their ETLs. One feedback method employed by STLs is called a Leadership Status meeting—a one-on-one meeting between the STL and ETL to provide feedback on performance, specifically, what areas are going well, what areas need work, and what areas on which the ETL should focus for improvement.

Target also maintains a Counseling and Corrective Action ("CCA") policy, which contains guidelines for corrective action of employees struggling with performance or engaging in misconduct. For performance problems, Target employs a progressive discipline policy. Target's CCA policy has three possible forms of corrective action for performance-based problems: (1) counseling; (2) final warning; and (3) termination. An employee who receives counseling is subject to a 30-day "critical" period, followed by a 6-month "extended period." If the employee exhibits significant and substantial improvement during the extended period, he or she will be removed from the counseling period. If the employee exhibits the same performance-based problem within the critical or extended time period, he or she will be subject to the next level of discipline—a final

warning. After receiving a final warning, the employee is subject to a 30-day "critical period," followed by a 12-month "extended period," during which he or she is expected to improve. If the employee does not improve, he or she may be subject to additional discipline, including termination, at the discretion of the management team.

Lippincott began her employment at the Target store in Elk Grove, California, as an ETL for Guest Services.  At the Elk Grove store, less than a year into her employment with Target, Lippincott received her first performance counseling. The counseling arose after one of her employees reported observing inappropriate advances made by a male worker towards a female co-worker. Under Target's sexual harassment policy, Lippincott was required to report the conduct to human resources for investigation.  However, she failed do so and, as a result, received a performance conduct notice.

Subsequently, upon her request, Lippincott was transferred by Target to its Penfield, New York, store where she became one of two ETLs for Hardlines. In that position, Lippincott was responsible for the direct supervision, assignments, evaluations and discipline of team leaders in a variety of departments, including health & beauty aides, electronics, domestics, toys, and non-clothing items. Then, in February 2008, Target transferred Lippincott to its Irondequoit, New York, store where she became the sole ETL for Hardlines. Target asserts it made the transfer to better position Lippincott to become a STL.  Lippincott counters that the transfer was to a struggling store in order to provide a pretext for her eventual dismissal. At the time of the transfer, the Irondequoit STL was Valerie Barbarito ("Barbarito"), and Target concedes that the Irondequoit store was its lower performing store.

Shortly after Lippincott's arrival, Barbarito expressed concerns to the District Team Leader ("DTL"), Randy Joseph, regarding Plaintiff's performance—specifically, her ability to hold her team accountable and to manage execution (such as ensuring transitions, department changes, and the overall presentation or "zone" of the store). In August 2008, Barbarito, who was under 40 at the time, resigned from Target after receiving a final warning for her own significant performance problems.

In about September 2008, Schultz became STL for the Irondequoit Target store. Lippincott and Schultz had worked together previously at the Penfield store where Schultz held an ETL position. At the Penfield store, their working relationship was "fine," and Lippincott "respected [Schultz] and his position." Pl. Dep. at 32:4-6. Schultz and Plaintiff also got along well at the Irondequoit store. *Id.* at 34:3–10. In contrast to his predecessor, Barbarito, Schultz had high expectations for the store, and, under his supervision, the Irondequoit store improved significantly and was no longer considered underperforming.

As the STL of the Irondequoit store, Schultz issued corrective actions to employees, including Ken Tillman, who was less than 30 years old when he received counseling for his performance that included a final warning. In approximately July 2009, Schultz, along with Lippincott, placed another employee, Christian Lyke ("Lyke"), who was 23 years old at the time, on formal corrective action.  Schultz critiqued Lyke for being one of Lippincott's employees who did not follow her instructions. Lyke was subsequently terminated. Schultz also terminated ETL Joshua Norcross, who was 35 years old, for unsatisfactory performance.

In accordance with Target policy, Schultz held monthly Leadership Status meetings with Lippincott to provide feedback on her performance. Generally, during the status meetings, Lippincott and Schultz would discuss some of the business objectives, which she would write down in the "Business Goals" and "My Team" portions of a Leadership Status form. Schultz would subsequently check off the "yes" or "no" boxes under the column "goals achieved," and write comments in the Feedback portion of the Leadership Status form to evaluate Lippincott's performance, then return the form to Lippincott.

In his first feedback to Lippincott in September 2008 on a Leadership Status Form, Schultz informed her that she should improve her talent management skills and provide feedback to her team leaders about performance expectations. Schultz also remarked that Lippincott should improve her execution of the sales plan. Schultz made similar comments in an October 2008 Leadership Status Form, noting that Lippincott had neglected to provide counseling in a timely manner to two team leaders under her supervision and did not meet any of the three business goals for the month.

Schultz reiterated the same problems in Lippincott's January 2009 Leadership Status form. While other areas of the Irondequoit store had improved, Lippincott's hardlines area had not, and under her supervision, her team leaders were becoming problem performers. Schultz encouraged Lippincott to hold her team leaders accountable and "demonstrat[e] some courage and hav[e] some tough conversations with them." Leadership Status form at 2, Def.'s Ex. 16, ECF No. 28-2.

Target has a practice of having its STLs in a district meet monthly with a human resources representative to discuss the performance of their personnel, including any coaching plans for employees and any need to engage in succession planning. In January

or February 2009, Schultz began to discuss Lippincott's performance issues and the coachings that he had provided her with Andrea Vaughan ("Vaughan"), the then-Human Resources Business Partner for the District that included the Irondequoit store. Vaughan would visit stores in the district monthly or every other month to monitor performance. Schultz also made his superior, Randy Joseph ("Joseph"), aware of Lippincott's problems, specifically her issues in managing execution and holding accountable her team members who were not performing their core roles.

In or around January or February 2009, Vaughan visited the Irondequoit store and, specifically, Lippincott's work center, identified as a "red" work center, which meant that she was not meeting expectations. Vaughan found that parts of Lippincott's work center were behind, and her zone's appearance was not up to Target standards.

In March 2009, Schultz met with Lippincott and gave her another Leadership Status form. In this feedback, Schultz indicated that Lippincott's "team leader brandwalks were inconsistent and lacked details that were required to bring hardlines results to where they need to be." Pl.'s Dep. at 85:1–86:7; Def.'s Ex.s 17 & 18. In addition, Schultz determined that "safety results and the safety culture for fiscal year 2008 were unacceptable." Pl.'s Dep. at 85:8–86:1; Def.'s Ex.s 17 & 18. Schultz cited an example of Lippincott's lack of oversight of her team members. Specifically, he noted that he had toured Lippincott's work center and created a list of items needing improvement and then distributed the list to Lippincott's employees. This, he stated, was a responsibility Lippincott should have undertaken herself. Schultz indicated to Lippincott that she should be more proactive in developing solutions to the problems that plagued her areas by, for instance, executing a plan for improvement and following up more regularly with her team. Ultimately, Schultz

asked her to be more critical of her team in her performance evaluations of them, because she needed a stronger team to attain the results needed.

During early 2009, Schultz and Vaughan discussed Lippincott's performance on at least three occasions, and Vaughan reviewed the coaching notices Schultz had given to Lippincott. On or about April 1, 2009, after reviewing Plaintiff's work performance, Vaughan suggested to Schultz that he place Lippincott on formal counseling. Schultz and Vaughan jointly began to draft Lippincott's counseling notice. Schultz created the first draft of the counseling notice on April 1, 2009.

Lippincott met with Schultz on April 3, 2009, to receive her 2008 annual performance review. At Target, each ETL receives two performance scores out of a total of 100 points. One score represents the ETL's self-evaluation, and the other score represents the evaluation awarded by his or her supervisor. A score of 90 and above is considered outstanding, 80 to 90 is excellent, 80 is average, and a score less than 80 is less than average. Plaintiff's self-evaluation reflected a score of 75, and Schultz provided her a score of 74, or less than average. Schultz's supervisor approved his score, which reflected Lippincott's difficulty in managing talent (including holding her team members accountable for their performance), managing execution (including driving efficiencies with the processes and team members), and maximizing relationships with her team members—all concerns which Schultz had raised in the Leadership Status forms he gave to Lippencort. Schultz also noted that Lippincott was "accepting mediocrities" from her team, and allowing some team members to neglect the tasks assigned to them. Annual Review (Fiscal Year 2008) at 3, Def. Ex. 20, ECF No. 28-2. In her own comments on her performance review, Lippincott agreed that several of her team members were not meeting

expectations, and set goals for herself to be more consistent and timely with feedback for her team leaders, and to hold them accountable for their performance.

On April 14, 2009, Schultz again met with Lippincott and provided her with a Leadership Status form, stating that she had not met her goals to improve the efficiency of the presentation team, or to improve guest services scores for the electronics department. Schultz told Lippincott that if she did not hold her team accountable, he would hold her accountable.

As part of its succession planning, Target typically posts open positions or positions which it might, but not necessarily, need to fill on its web site, www.target.com. Target uses the responses to such postings to gauge the amount of talent in the market should it need to fill such positions. Where a position is currently filled but posted due to an employee's performance problems, Target typically omits the exact store location for the position, and only posts the District in which the position is located. Posting of the position does not necessarily mean that the employee holding that position will be replaced, and Target has provided an example of an employee whose position was posted, but he was not replaced.

In April 2009, after Vaughan suggested formal corrective action for Lippincott, Target posted her position at Vaughan's request and with Joseph's approval. Target has two recruitment teams: one team focuses on finding experienced candidates, while the other focuses on recruitment at college campuses. When Vaughan made the requisition for the ETL-Hardlines position, she sought a candidate with experience, which is why the position was posted on the web site. Vaughan did not intend for the Irondequoit store to be identified in the web site posting with the position, and she was unaware that it would be posted in that manner. Through an inadvertent error at the recruiter level, the specific

store was identified, rather than identifying the Rochester District as a whole.

On April 29, 2009, Lippincott saw the posting and printed a copy. She met with Kristal Schaffer ("Schaffer"), the ETL of Human Resources for the Irondequoit store to discuss the posting. Lippincott showed Schaffer the posting, said she felt she was being targeted for work performance, and assumed the posting meant she would be discharged. Schaffer referred Lippincott to Target's Integrity Hotline, which Lippincott called the following morning. Lippincott explained in the Hotline call that her job had been posted, that she had not received any formal corrective action, and that she believed this was an example of a pattern of attempts to eliminate older, higher paid employees.

As a result of the Hotline call, Don Weldon ("Weldon"), Regional Employee Relations Manager for Target, was assigned to investigate. Weldon questioned Schultz, collected relevant documents, and notified Vaughan of the erroneous posting, which listed the Irondequoit store specifically, instead of the Rochester District generally. Vaughan corrected the posting following a discussion with Weldon. Weldon attempted to contact Lippincott by email on May 3, 2009, a Sunday, but because of a typographical error in the email address he used, was not successful in reaching her until May 5, 2009. Weldon and Lippincott met on May 8, 2009, and Lippincott repeated her concern that she would be terminated because of her position being listed on Target's web site and because of her age. Weldon explained Schultz's documentation of Lippincott's inconsistent performance, and Lippincott said that Schultz had not been direct enough with her about her performance. Weldon further explained that the posting was part of Target's succession planning, and did not mean that Lippincott was going to be terminated. After meeting with Weldon, Lippincott understood that Schultz was not responsible for the posting. Weldon's

investigation resulted in his conclusion that no evidence supported Lippincott's allegation of age discrimination. He issued his report on May 15, 2009.

Schultz next met with Lippincott on May 8, 2009 to discuss her belief that he had not been direct enough about her performance issues. He also gave her a May 2009 Leadership Status form. In it, Schultz noted that Lippincott's "inability to set standards, follow up, and hold leaders on [her] team accountable makes managing execution very difficult," and that this was not the first time he had spoken to her about holding her team accountable. Pl.'s Dep. 131:14-132:15, 134:18-135:3; Def.'s Exs. 24, 25. In sum, Schultz characterized Plaintiff as "a problem performer that is trending toward a work performance counseling, unless [she] is able to make immediate and consistent improvements." Pl.'s Dep. at 132:24-133:6. Schultz set up weekly performance meetings with Lippincott to help address these concerns.

Subsequently, at the May 22, 2009, mid-month status meeting, Schultz noted some improvements in Lippincott's performance, but also stated that her zoning and team leader brandwalks were unacceptable, and that her presentation status was a continued problem. Lippincott agreed with Schultz's critique of her performance and felt that this list provided specific, direct items for improvement.

Subsequently, on May 29, 2009, Schultz gave Lippincott her first formal corrective action notice, which he had begun drafting on April 1, 2009, read it to her, and asked her if she had any comments. She did not. At Schultz's request, Lippincott gave Schultz her corrective action plan on June 6, 2009, and Schultz provided feedback to her on it on June 9, 2009.  They met again on July 3, 2009, and July 7, 2009.

On July 7, 2009, Schultz called Lippincott to his office and presented her with a formal final warning. The final warning noted that Lippincott had failed to manage execution, by not coordinating the time, people and resources available to her to meet her key goals, citing numerous examples of unacceptable conditions in her work zone. The warning further noted her inability to accept responsibility for her own performance and actions, and her failure to follow up on commitments. Finally, the warning highlighted Lippincott's   ineffective management of her talent, recognizing that she had failed to provide clear, motivating and constructive feedback to her team, and to take action when team members were not meeting expectations.

On July 7, 2009, within an hour of receiving her final warning, Lippincott resigned from Target. In resigning, she made negative comments directed toward Schultz and warned him that this would not be the last time he heard her name. Lippincott concedes that Target did not discharge her:

> Q. Now, you resigned that day—let me rephrase that. You were placed on a final warning, you were not terminated, correct?
>
> A. Correct.
>
> Q. Why did you choose to resign?
>
> A. Because the—my knowledge is as common practice, once a final warning is issued, then you will be terminated.…
>
> Q Okay. Do you know of anybody that's received a final warning and not been terminated?
>
> A. I don't.
>
> Q. Do you know that Mr. Schultz has received a final warning?

A. I did not know that.

Q. Do you know that others have received final warnings and not been terminated?

A. I do not know that.

Q. So you assumed when you received the final warning that you were going to be terminated, so you chose to resign that day, instead. Is that—is that fair to say?

A. Yes.

Q. Were there any other reasons that you chose to resign other than the fact that you felt you were going to be terminated regardless?

A. No.

Pl.'s Dep. at 187:17–24, 188:4–21.

In opposing summary judgment, Lippincott contends that,

In spite of Plaintiff's improved performance, Plaintiff was issued a Final Warning just 4 days after her leadership status meeting with Schultz, proving that Defendant intended on terminating Plaintiff regardless of her job performance, and further that Defendant's Corrective Action Process, at least with regard to Plaintiff, was entirely pre-textual.

Pl.'s Response to Def.'s Local Rule 56(a)(1) Statement ¶ 101, Apr. 30, 2012, ECF No. 31-2. Significantly, Lippincott does not contest the following contained in Target's local rule 56(a)(1) statement of facts: "Target does not have a policy of eliminating older employees.… Target strives to recruit talented employees, irrespective of age…, and it focuses on finding and keeping employees with leadership skills." *Id*. ¶ 105. She further offers that when hired in 2005, she had over 20 years of retail experience in various leadership positions, and had become known as a top performer in Penfield. She also contends that older employees were being targeted as problem performers and placed on

courses of corrective action leading to their termination.  Schultz maintains that he based

his critique of Lippincott entirely on her performance and that he never once made a

comment concerning her age.  In response, Lippincott alleges that Schultz admitted in an

email to Don Weldon that Lippincott was "not the kind of team member that I want on my

team," and that he said he was displeased that Lippincott, "feels like Target is profiling and

that she is too old to be promoted or do more with Target." Jeff Schultz email to Don

Weldon (Apr. 30, 2009), Pl.'s Ex. E at 3. The email states in pertinent part as follows:

```
From:      Jeff.Schultz (T2211)
Sent:      Thursday, April 30, 2009 6:39 PM
To:        Don.Weldon
Subject:   FW: Elice 4-13:2

TGT-09-04-1132
Don,
Coaching conversation from about two weeks ago Jeff Schultz…

From:      Jeff.Schultz (T2211)
Sent:      Tuesday, April 14, 2009 9:31 PM
To:        Jeff.Schultz (T2211)
Subject:   Elice 4-13:2

Today after ELice' s status Elice expressed her concerns about "how
she was going nowhere" with Target. She feels like Target is
profiling and that she is too old to be promoted or do more with Target.
I did not offer her a get your area to green and I'll try to get you
to another position because at this point I do not see her having
the drive and hands on approach that will be needed to correct the
deficiencies that I am seeing in hardlines. Over the last 4 months
I have been delivering a very consistent message that things are not
acceptable in her areas.
Presentation
PTM
Brand walks
these are the three primary concerns which then lead to a bad zone,
decreased morale, Red/yellow DTL vsits, and mediocre guest
experience, results.

Today Elice expressed to me that she just wants to do her job 'and
get a bonus.
This is not the kind of team member that I want on my team.
She is not team orientated. On her leadership expectations training
module her lowest category was "collaborates"
```

*Id*. Lippincott also points out that she was replaced by Laura Martin, who was less than forty years of age.

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interroga- tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).   "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that,

by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted); *Meri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### Age Discrimination in Employment Act (ADEA)

To establish a *prima facie* case in an ADEA action, a plaintiff must show that "(1) he was within the protected age group; (2) he was qualified for the job; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination." *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 83 (2d Cir. 1990) (citation omitted). The ADEA protects employees who are "at least forty years of age." 29 U.S.C. § 631 (1989). Under the ADEA, it is unlawful for an employer to discharge an employee because of that employee's age. *See* 29 U.S.C. § 623(a)(1). To prove constructive discharge, a plaintiff must show that the employer "deliberately made an

employee's working conditions so intolerable . . . that a reasonable person in the employee's shoes would have felt compelled to resign." *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (internal citations omitted).

The Supreme Court has observed that the substantive prohibitions under the ADEA mirror those under Title VII of the Civil Rights Act of 1964. *See Lorillard v. Pons*, 434 U.S. 575, 584 & n. 12, 55 L. Ed. 2d 40, 98 S. Ct. 866 (1978). Accordingly, the Second Circuit has held "that the evidentiary framework measuring discrimination under the ADEA borrows from Title VII case law." *Hollander*, 895 F.2d at 83. Therefore, the Court employs the burden-shifting analysis from the Supreme Court's Title VII jurisprudence as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

> Under *McDonnell Douglas* and *Burdine*, the plaintiff first must establish a *prima facie* case of discrimination. The burden then shifts to the employer to counter the *prima facie* case by advancing a legitimate, non-discriminatory reason for its actions. The plaintiff in turn may attack the employer's explanation by showing evidence that the purported non-discriminatory reason was not true and in fact was a pretext for discrimination. *See Burdine*, 450 U.S. at 252-53, *McDonnell Douglas*, 411 U.S. at 802-04.

*Hollander*, 895 F.2d at 83. In addition, claims under the New York Human Rights Law are similarly analyzed. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

In *Hicks*, the Second Circuit set out the standards for a retaliation claim under Title VII, which is similarly applied to an ADEA case:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). First, the plaintiff must establish a prima facie case of retaliation by showing: "'(1) participation in a

protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Jute*, 420 F.3d at 173 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001)). The plaintiff's burden in this regard is "de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*. (internal quotation marks omitted).

*Hicks*, 593 F.3d at 164.   An employment action is considered materially adverse for the purposes of retaliation claims if the action would dissuade a reasonable employee from making a workplace discrimination claim.  *White v. Dept. of Corr. Servs.*, 814 F. Supp. 2d 374, 387-88 (S.D.N.Y. 2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

**ANALYSIS**

In moving for summary judgment, Defendant contends that Lippincott failed to make a *prima facie* case under ADEA of both age discrimination and retaliation.   The Court agrees.   The Court first turns attention to Lippincott's age discrimination claim. The evidentiary proof before the Court on this motion shows that Lippincott was within the protected age group and, *arguendo*, was initially qualified for the job in satisfaction of the first two elements.  However, as to the third requisite of a *prima facie case*, Lippincott has failed to establish that she suffered any adverse employment action.

In this regard, Lippincott's argument that she was constructively discharged is based on her supposition that once a Target employee received a final warning, it was only a matter of time before that employee would be fired. However, Lippincott's own supervisor, Schultz, had once been placed on a final warning. Moreover, Lippincott *admits* that being

placed on final warning does not mean an employee will be terminated. Pl.'s Response to Def.'s Local Rule 56(a)(1) Statement ¶¶ 102–04. Having conceded the point, Lippincott is not in a position to argue here that she was constructively discharged.

Furthermore, even if Lippincott could prove constructive discharge, she provides no evidence that age discrimination was a motivating factor in her discharge.  There is no evidence that Schultz, Lippincott's supervisor, demonstrated any animus against her based upon her age. The only evidence[1] Lippincott presents is the email from Schultz to Don Weldon in Target's Human Resources Department that, *inter alia*, he did not want Lippincott on his team: "She is not team orientated [sic]. On her leadership expectations training module her lowest category was 'collaborates'." Jeff Schultz email to Don Weldon (Apr. 30, 2009), Pl.'s Ex. E at 3. Schultz also wrote, "I do not see her having the drive and hands on approach that will be needed to correct the deficiencies that I am seeing in hardlines." *Id*. He explained in the next paragraphs what he meant: "Over the last 4 months I have been delivering a very consistent message that things are not acceptable in her areas. Presentation. PTM. Brand walks. These are the three primary concerns which then lead to a bad zone, decreased morale, Red/yellow DTL visits, and mediocre guest experience, results." *Id*. Finally, he related to Weldon what Lippincott said to him: "Today Elice expressed to me that she just wants to do her job and get a bonus."  None of these statements indicate a discriminatory purpose, but rather legitimate performance concerns.

---

[1] Lippincott also includes her own speculations and hearsay from a former manager. *See* Lippincott Aff. ¶¶ 11 & 12, Apr. 30, 2012, ECF No. 31-7.

Although Lippincott contends that Target has a policy of targeting older employees, she also *conceded* that Target does not have a policy of eliminating older employees. *Compare* Pl.'s Response to Def.'s Local Rule 56(a)(1) Statement ¶ 105, Apr. 30, 2012, ECF No. 31-2, *with* Pl.'s Statement of Additional Material Facts As Per Rule 56(a)(2) ¶¶ 3 & 4, Apr. 30, 2012, ECF No. 31-2. Lippincott lists employees who she argues are examples of older employees being terminated. *Id*. ¶¶ 67-69. However, one, George Borrelli, was not fired, but, as Lippincott concedes, voluntarily resigned. *Id*. ¶ 70. Another, Becky Pulos was discharged for performance issues. Yet another, Peter Pulos was discharged for a conduct issue, after he failed to secure the building on two occasions, which Target stated, and Lippincott conceded, was a serious violation, and only after he received corrective action for the same offense. *Id*. Lippincott also concedes that she had no basis to believe that Peter Pulos was discharged based upon age, other than her own assumption. *Id*.[2]

Even if Lippincott could make a *prima facie* case of age discrimination, Target has come forward with legitimate nondiscriminatory reasons for Lippincott's corrective actions. Target's evidence shows that Lippincott's performance consistently fell below standards. Her supervisor provided her with detailed assessments of the deficiencies and warned her, time after time, that she needed to hold her own employees accountable, which she failed nonetheless to do. Such a showing by Target shifts the burden back to Lippincott to provide evidence that Target's proffered explanation is in fact pretext for age discrimination.   Lippincott has failed to come forward with any evidentiary proof in

---

[2] As stated at oral argument, this Court will not tolerate misrepresentations in Plaintiff's briefs. It is inconceivable that a conscientious attorney would file documents on the same day that contain such glaring contradictions.

admissible form that Target's performance concerns were false and that her age was a motivating factor in any employment decisions.

Next the Court turns to Lippincott's retaliation claim.  Lippincott has shown she was engaged in a protected activity by making a Hotline complaint concerning age discrimination, and that Target knew of the protected activity. Lippincott has also shown an adverse employment action (being put on formal corrective action), as determined by the lower retaliation standard. *See White*, 814 F. Supp. 2d at 387-88 ("the action would dissuade a reasonable employee from making a workplace discrimination claim."). However, Lippincott fails to make a *prima facie* case of retaliation, since she failed to prove that the adverse employment action was causally connected to the age discrimination complaint.

Lippincott has conceded that Schultz and Vaughan made the decision to place her on formal corrective action as of April 1, 2009. Pl.'s Response to Def.'s Local Rule 56(a)(1) Statement ¶¶ 47 & 48. Lippincott's argument that her formal corrective action was the result of her protected hotline call, Pl.'s Mem. of Law at 22–23, is therefore contradicted by her own concession. It is undisputed Schultz and Vaughan decided to place Lippincott on formal corrective action as of April 1, nearly a month prior to the protected age discrimination report on April 30, 2009, but simply did not deliver the formal notice to Lippincott until after the call.  Therefore, the evidentiary proof does not support Lippincott's argument that a material issue of fact exists with regard to causal connection.

Furthermore, Target has come forward with a legitimate, non-retaliatory reason for the adverse employment action, Lippincott's work performance as discussed above. Consequently, "the presumption of retaliation dissipates and the employee must show that

retaliation was a substantial reason for the adverse employment action." *Jute*, 420 F.3d at 173. Even if Lippincott could make a *prima facie* case, she has not met this final burden.

Lippincott has not shown that Target's proffered reason for placing her on formal corrective action after her Hotline call was not true and in fact was a pretext for retaliation. Lippincott has offered merely her own conjecture without evidentiary support, and a conclusory hearsay statement from a former employee as her proof of pretext. It is insufficient. Moreover, the evidence overwhelmingly shows that Schultz documented deficiencies in her performance and offered constructive advice for correction to Lippincott several times before he gave her the formal notice.

## CONCLUSION

For the reasons stated above, defendant Target Corporation's motion, ECF No. 27, seeking summary judgment, is granted. The Clerk shall enter judgment for Target Corporation and close this case.

IT IS SO ORDERED.

Dated:   July 10, 2012
         Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J.  SIRAGUSA
United States District Judge